# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

LINDA LEE GUILLORY, as Personal Representative
of the Estate of Charles Wayne Guillory, Deceased

       Plaintiff,

vs.                                      **CASE NO.  8:20-cv-01208**

UNITED STATES OF AMERICA

       Defendant.

_____/

## COMPLAINT

Plaintiff Linda Lee Guillory, as personal representative of the estate of Charles Wayne Guillory, deceased, sues Defendant United States of America, and alleges:

1.     This is an action for damages arising under the Federal Tort Claims Act, 28 USC §§ 2671 et seq. This court is vested with subject matter jurisdiction pursuant to 28 USC § 1346(b).

2.     At all material times, Linda Lee Guillory and Charles Wayne Guillory were husband and wife residing in Citrus County, Florida, within the Middle District of Florida. Venue is proper in this District because the acts and omissions complained of herein occurred in Tampa, Hillsborough County, Florida and within the Middle District of Florida.

3.     The estate of Charles Wayne Guillory is being probated in Citrus County, Florida, Probate Division Court Case No. 2019-CP-267 and Linda Lee Guillory has been

appointed personal representative. A copy of the Letters of Administration is attached hereto and incorporated herein as "Exhibit A".

4.      At all material times, Defendant United States of America, by and through the Department of Veterans Affairs, owned and operated the James A. Haley Veteran's Hospital ("Haley VA") in Tampa, Florida.

5.      At all material times, Mr. Guillory was a United States military veteran eligible for benefits from the Department of Veterans Affairs including treatment at Haley VA.

6.      On March 19, 2018, Mr. Guillory was admitted to Haley VA with a preoperative diagnosis of left ureteral cancer for an operation to remove the left kidney and ureter, in medical terms a "laparoscopic left nephroureterectomy with open bladder cuff removal", to be conducted that same day by a Urology team led by attending surgeon Justin L. Parker, M.D.  Dr. Parker had informed Mr. Guillory that his cancer was very aggressive and would need to be surgically removed hence the need for the surgery.

7.      According to the operative report, the operation was "uneventful" and completed without any known complications. Surgical pathology found only a small tumor in the ureter which was determined to be low grade papillary urothelial cancer, the most common form of bladder cancer, not the type of cancer that Dr. Parker had warned Mr. Guillory to expect.

8.      At 4:32 p.m., Mr. Guillory recovered enough from anesthesia to be transferred to the surgical intensive care unit ("SICU") however, within 20 minutes of arrival, Urology was paged that Mr. Guillory was experiencing low blood pressure and

increased heart rate. He was assessed by Urology at 5:05 and fluids provided. Lab tests taken at the same time also found his hemoglobin blood level was low at 10.9 L with normal considered to be 13 – 17.

9.     At 6:13 p.m., Urology was again paged and informed of continued low blood pressure and given orders to administer more fluids. At 7:08 p.m., Urology was again at bedside to assess Mr. Guillory and was once more a bolus of additional fluid was given. At that time, service was switched from Urology to SICU service.

10.     Repeat blood labs were drawn at 8:40 p.m. that showed further decrease in hemoglobin to 8.8L. Afterwards, Mr. Guillory continued to remain hypotensive. At 11:16 p.m., another blood lab found further decrease in hemoglobin to 8.6 L when he was given a transfusion of 1 unit of packed red blood cells.

11.   At 3:11 a.m. on March 20, nursing again reported he was hypotensive, with elevated heart rate, nauseated, complaining of "incisional pain", and noted to have scant urine output. At 4:00 a.m., another blood test showed his hemoglobin had increased to 9.6 consistent with the blood transfusion.

12.     At 4:30 a.m., nursing reported Mr. Guillory remained with low urine output (oliguric), had low blood pressure (hypotensive), with a fast heart rate (tachycardic) and was again given a one liter fluid bolus of normal saline. At 5:54 a.m., nursing was given orders to increase the IV drip, which they did.

13.     At 6:49 a.m., Urology nurse practitioner Janda Moldenhauer recorded a progress note after seeing Mr. Guillory stating his BP was "stable overnight", heart rate was 80-90s, and otherwise indicated no problems.

14.     In contrast, at 8:49 a.m., surgery intensive care resident Dr. Mark Conant noted that Mr. Guillory had "hypotension overnight, was transfused one unit of PRBCs with proper response and a total of 5 L including intraoperative fluids. Patient now normotensive however with borderline UOP (urine output) and persistent sinus tachycardia (fast heart rate)." Dr. Conant reported that hemodynamically there was "no active signs of bleeding" and directed that he remain under "ICU care for now for close HD (hemodynamic) monitoring."

15.     At approximately 10:00 a.m., nursing helped Mr. Guillory out of bed to sit in a chair and noted a corresponding significant decrease in blood pressure and increased heart rate. Once settled, blood pressure slightly increased and heart rate slowed but both were still abnormal.

16.     At 10:49 a.m., Certified Registered Nurse Anesthetist (CRNA) Paul Safara recorded an anesthesia post-operative note after visiting Mr. Guillory in which he noted finding abnormal cardiovascular function and that the primary care nurse was aware. CRNA Safara was so concerned that he contacted anesthesiologist Dr. Paul Tan and Dr. Parker with regard to his abnormal heart rate and hypotensive findings on post-op rounds.

17.     At about 12:00 noon, nursing noted that Mr. Guillory had become increasingly further hypotensive. At 12:06, SICU resident Dr. Conard was informed that blood labs drawn at 11:30 showed his hemoglobin had again fallen to 8.8, which is consistent with internal bleeding.

18.     At 1:03 p.m., Dr. Parker recorded a progress note after seeing Mr. Guillory that recognized the overnight issues and the decreasing hemoglobin as well as the "pale and

visibly uncomfortable" appearance. However, Dr. Parker opined it was "unclear if concerns for bleeding or other hemodynamic concerns" despite there being no evidence other than the likelihood of active internal bleeding to be the cause of Mr. Guillory's declining symptoms post-operatively. Dr. Parker then deferred to ICU team for management and agreed with a plan for a CT scan concluding that "at completion of the surgery there was no concern for bleeding but this remains a possibility."

19.     Another unit of packed red blood cells was then administered and SICU placed a central line to provide further access. Ativan was given for increased anxiety that Mr. Guillory was reporting. Suddenly around 1:30 p.m., Mr. Guillory became unresponsive. A code stroke was called at 1:40.  At 1:45, he was intubated to protect his airway and further resuscitation efforts provided including another unit of packed red blood cells. At 2:05 blood labs were drawn again and reported at 2:30 to show hemoglobin had falling below critical value levels to 6.8 L.

20.     The SICU staff talked to Dr. Parker and decided to take Mr. Guillory emergently directly to the operating room for exploratory laparotomy because he was thought to be bleeding in his stomach and unlikely to have experienced a stroke.

21.     At 2:40, Mr. Guillory was received in the operating room from SICU and at 2:45 p.m. anesthesia was induced so the operation could begin. Upon entry, a large volume of blood was found in the abdomen and a bleeding arterial vessel located in the pelvis near the base of the bladder which was repaired. Additional blood was transfused during the operation.

22. As a direct result of the undiagnosed bleeding and failure to timely respond, Mr. Guillory suffered from a lack of sufficiently oxygenated blood profusion that caused an anoxic brain injury and acute kidney injury to his one remaining kidney. Subsequent CT scans of the brain found no acute intracranial findings confirming he did not suffer an embolic stroke but rather an anoxic brain injury from lack of oxygen.

23. From that time until his death, Mr. Guillory suffered disorientation from altered mental status, hemiparesis of the entire right side of his body, and additional complications due to the anoxic brain injury and acute kidney injury. He fully recovered from the effects of the surgery but not the anoxic brain and kidney injuries which were permanent and irreparable.

24. On April 26, 2018, Mr. Guillory was discharge with complications that directly resulted from the anoxic brain injury and now chronic kidney injury for long term acute care at Florida Hospital Connerton (now Advent Health), and subsequently to Healthsouth Brooksville and Citrus Health & Rehabilitation Center, for treatment of conditions that directly resulted from the subject errors in treatment at the Haley VA, including, but not limited to: spastic hemiplegia of the right arm and leg, left arm dysfunction and left leg impairment, expressive aphasia (loss of ability to understand or express speech, caused by brain damage), dysphagia (inability to swallow), and chronic kidney disease.

25. Mr. Guillory's medical condition never improved, and he suffered daily from effects of his injuries while continuing to decline. With no further hope of recovery, Mr. Guillory was discharged to his home under the care of the Gainesville Veterans Hospital

home care where he died on January 8, 2019 due to the physical injuries and complications from the anoxic brain injury and kidney injury as a direct result of the delayed recognition and timely treatment of the post-operative bleeding.

26.    At all material times, Dr. Parker and the Urology/SICU team were employees or agents of Haley VA and in doing or omitting to do all the things alleged herein, were acting within the scope of their employment with the permission and consent of Defendant.

27.    The direct and proximate cause of Mr. Guillory's injuries and death was the negligence of Dr. Parker and/or the Urology/SICU team by failing to timely diagnose the post-operative bleeding and respond accordingly.

28.    As a direct and proximate result of the negligence of Defendant's employees or agents, Mr. Guillory's estate incurred damages, including, but not limited to, medical expenses and funeral expenses due to his injury and death.

29.    As a further direct and proximate result of the negligence of Defendant's employees or agents, Mrs. Guillory suffered damages, including, but not limited to: the loss of Mr. Guillory's future support and services from the date of his injuries; the loss of Mr. Guillory's companionship and protection; travel and funeral expenses due to Mr. Guillory's injury and death; and mental pain and suffering from the date of Mr. Guillory's injury.

30.    Plaintiff filed a claim for administrative settlement with the Department of Veterans Affairs for the sum of $20,000,000. The Department of Veterans Affairs has failed to make a final administrative disposition of Plaintiff's claim.

WHEREFORE, Plaintiff demands judgment against Defendant for damages plus appropriate interest, costs, and such other relief as this Court deems just and proper.

Respectfully submitted,

DAVID D. DICKEY, ESQ.
Florida Bar # 949019
THE YERRID LAW FIRM
101 East Kennedy Blvd., Suite 3900
Tampa, FL  33602
Telephone: (813) 222-8222
Facsimile:  (813) 222-8224
*Attorneys for the Plaintiffs*
DDickey@yerridlaw.com